691 P.2d 302

TANQUE VERDE ENTERPRISES, an Arizona corporation, dba Tanque Verde Swap Meet, Plaintiff/Appellee/Cross Appellant,

v.

The CITY OF TUCSON; Lewis Murphy, Mayor; Tucson City Council, and Jim Kay, Finance Director, Defendants/Appellants/Cross Appellees.

No. 17489–PR.

Supreme Court of Arizona, In Banc.

Nov. 1, 1984.

538

Richard B. Arrotta, Tucson, for plaintiff/appellee/cross appellant.

Frederick S. Dean, Tucson City Atty. by Michael G. Wood, Asst. City Atty., Tucson, for defendants/appellants/cross appellees.

GORDON, Vice Chief Justice:

In 1975, Tanque Verde Enterprises (Tanque Verde) began operation of a swap meet on Tanque Verde Road, then just outside Tucson, Arizona. Tanque Verde rents spaces to vendors from which they display and sell their wares.

On April 7, 1981, the City of Tucson (the City) annexed the land upon which the Swap Meet sits, thus subjecting Tanque Verde to § 19–28(149) of the Tucson Code. This Code section required Tanque Verde to pay the City each month an occupational license tax of $1.00 per vendor space plus two per cent of its gross receipts. It is conceded this fee was a revenue raising tax. Since the average price for a vendor space was $5.50, the tax, on a percentage basis, amounted to nearly twenty per cent of gross income. Tanque Verde, under protest, paid the occupational license tax for the period of April 7, 1981, to April 30, 1981 ($5,343.12) and for the month of May, 1981 ($8,909.11).

Shortly after these payments, on June 1, 1981, the City repealed § 19–28(149) and enacted a new § 19–28(149). This revised ordinance required swap meet proprietors to pay an occupational license tax of four per cent of gross receipts.[1] After the City

denied reimbursement of the taxes paid under protest, Tanque Verde filed suit on July 14, 1981, challenging both versions of the swap meet proprietor tax on various grounds. The trial court heard the matter without a jury and made numerous findings of fact and law, several of which relate to this review.

First, the trial court found the license tax to be a revenue raising tax exercised with proper legal authority pursuant to the Tucson Charter. See Tucson City Charter, Chapter IV, § 1(18). Nevertheless, the court ruled the tax of April and May of 1981 to be confiscatory. The trial court found the tax so excessive that it constituted an unconstitutional taking of property under the Fourteenth Amendment. Finally, the court found the revised four per cent tax of Tanque Verde's gross receipts to be valid, so long as such tax was not confiscatory.

Both parties appealed the trial court's decision to the Arizona Court of Appeals, Division Two. The Court of Appeals affirmed all the trial court's findings except the one finding the April and May, 1981 tax to be confiscatory. According to the Court of Appeals, this finding was clearly erroneous because it was based upon speculation instead of concrete facts showing a cause and effect relationship between the City's tax and the destruction of the swap meet industry in Tucson. Tanque. Verde Enterprises v. City of Tucson, 142 Ariz. 544, 691 P.2d 310 (1983).

Tanque Verde petitioned this Court to review the decision of the Court of Appeals. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and Ariz.R.Civ. App.P. 23. We decide one issue: Whether the trial court's decision that the April and May, 1981 tax was confiscatory was supported by substantial evidence.

We reverse the trial court's finding that the April and May, 1981 tax was confiscatory. Furthermore, as the Court of Appeals grounded its opinion concerning confisca-

1. Though the City repealed the April and May, 1981 tax, its validity remains in question be-

cause Tanque Verde is asserting its right to a refund of taxes paid under protest.

tion on erroneous assumptions of law, we vacate that portion of the opinion.

The Fourteenth Amendment to the United States Constitution forms the basis of Tanque Verde's claim.[2] Obviously, therefore, case law construing that amendment must govern here. Unfortunately, both parties and the Court of Appeals have relied almost entirely on cases construing state statutes and constitutions. Consequently, the law presented to this Court is largely inapplicable.[3] Thus, before proceeding with the applicable law, we will dispose of the bulk of the cases the parties presented to this Court.

Though relied upon heavily by both parties and the Court of Appeals, *Kaufman v. City of Tucson,* 6 Ariz.App. 429, 433 P.2d 282 (1967) has no bearing on the instant case. In *Kaufman,* the Court of Appeals considered the propriety of Tucson's increase in a liquor licensing fee. Finding the increase proper, the court stated that city liquor licensing fees were valid so long as such taxes did not annihilate the retail liquor industry in the city.

Importantly, however, the court based this statement not upon the Fourteenth Amendment, but upon A.R.S. § 4–223, subsec. B.[4] This statute empowers the City to impose liquor licensing fees, but it also reserves to the state the power to prohibit the liquor retail business. Thus, in *Kaufman,* since an Arizona statute prevented the City from prohibiting the liquor industry, the City could not annihilate the industry through taxation. As state law provided the entire basis for *Kaufman,* it cannot

govern the instant case which is grounded on a Fourteenth Amendment claim.

The Kentucky cases cited by the City and the Court of Appeals also have no relevance to this review. Those cases construe a Kentucky constitutional provision granting the legislature the power to impose excise taxes. The Kentucky cases make no mention of the United States Constitution or any amendments thereto. *See Foster Trading Corp. v. Luckett,* 303 S.W.2d 315 (Ky.App.1957); and *Martin v. Nocero Ice Cream Co.,* 106 S.W.2d 64, 269 Ky. 151 (1937). *See also Stewart Dry Goods Co. v. Lewis,* 294 U.S. 550, 55 S.Ct. 525, 79 L.Ed. 1054 (1935) (dissenting opinion). As sensible as Kentucky law may be, it has no application here.

Finally, the New Jersey case the City and the Court of Appeals relied upon also has no applicability to the instant action. That case, *Bellington v. Township of East Windsor,* 17 N.J. 558, 112 A.2d 268 (1955), interprets a New Jersey statute authorizing municipalities to enact license taxes. *See Nelson Cooney & Son, Inc. v. Township of South Harrison,* 57 N.J. 384, 273 A.2d 33 (1971). Again, cases construing local statutes have no relevance to claims made under the Fourteenth Amendment.

■ The well-settled constitutional standard, ignored by the parties, grants taxing authorities unlimited discretion to set the rate of taxation of a legally imposed revenue raising tax. *City of Pittsburgh v. Alco Parking Corporation,* 417 U.S. 369, 94 S.Ct. 2291, 41 L.Ed.2d 132 (1974); *Mag-*

---

**2.** Tanque Verde has not made any claim under Ariz.Const.Art. 2, § 17 or any other Arizona constitutional or statutory provisions. We therefore, do not reach such questions.

**3.** The parties and the Court of Appeals assumed that under the Fourteenth Amendment, courts could overturn taxes because they were prohibitory, or, put another way, that courts could strike down taxes that had the effect of annihilating an industry within the jurisdiction where the tax was effective. An assortment of cases was cited to support that proposition. As this opinion will illustrate, most of those cases are inapplicable here. Though the parties and the Court of Appeals cited one applicable case, *Mag-*

*nano Co. v. Hamilton, infra,* they misread that case.

**4.** A.R.S. § 4–223 provides:

"A. In addition to the taxes provided for in this chapter, incorporated cites and towns shall have the power to tax the manufacture, sale, possession, distribution, and disposal of spirituous liquors within their corporate limits, but this section shall not apply to wholesalers licensed under § 4–209.

"B. This section shall not be construed to give to incorporated cites and towns power to prohibit the manufacture, sale, distribution, and disposal of intoxicating liquors."

*nano Co. v. Hamilton,* 292 U.S. 40, 54 S.Ct. 599, 78 L.Ed. 1109 (1934); *McCulloch v. Maryland,* 4 Wheat. 316, 17 U.S. 316, 4 L.Ed. 579 (1819). A court will not invalidate a legally imposed revenue raising tax under the Fifth or Fourteenth Amendment because of the results that arise from the imposition of that tax. *City of Pittsburgh v. Alco Parking, supra; Stewart Dry Goods Co. v. Lewis, supra; Magnano Co. v. Hamilton, supra.* Thus, the judiciary will not invalidate a revenue raising tax solely because it is excessive. *City of Pittsburgh v. Alco Parking, supra; Magnano Co. v. Hamilton, supra.* This rule holds true even if the tax may or will result in restricting or destroying a particular business or occupation. *City of Pittsburgh v. Alco Parking, supra; Magnano Co. v. Hamilton, supra; Alaska Fish Salting & By-Products Co. v. Smith,* 255 U.S. 44, 41 S.Ct. 219, 65 L.Ed. 489 (1921). Furthermore, the collateral purposes or motives of a legislature in levying a tax of a kind within its lawful power are matters beyond the scope of judicial inquiry. *City of Pittsburgh v. Alco Parking, supra; Magnano Co. v. Hamilton, supra.* These rules apply to Congress under the Fifth Amendment and to state legislative authorities under the Fourteenth Amendment. *City of Pittsburgh v. Alco Parking, supra; Magnano Co. v. Hamilton, supra.*

In *Alco Parking,* the Supreme Court considered a revenue raising tax nearly identical in effect to the one the City of Tucson imposed. The City of Pittsburgh levied a twenty per cent tax on the gross receipts of private nonresidential parking operators. The parking operators alleged the heavy burden of the tax along with unfair competition from the City of Pittsburgh constituted an unconstitutional taking of private property without due process of law in violation of the Fourteenth Amendment.

To prove their claim, the parking operators produced impressive evidence showing the substantial loss they would incur each year as a result of the tax. Of those parking operators still able to make some profit, the one showing the highest profit would earn only 2.9 per cent of gross reve-

nue. Furthermore, the parking operators demonstrated the impossibility of passing the tax on to their customers because the City Parking Authority, exempt from the tax, could charge less. Finally, the parking operators showed the City increased the tax rate from 15 per cent in 1969 to 20 per cent in 1970 despite the parking operators' heavy losses due to the 15 per cent tax. *Alco Parking Corp. v. City of Pittsburgh,* 6 Pa.Commw. 433, 291 A.2d 556 (1972).

The Supreme Court rejected the claim, however, stating that neither the burdensome tax nor unfair competition, either alone or together, could invalidate the tax. As stated by the Court:

> "The claim that a particular tax is so unreasonably high and unduly burdensome as to deny due process is both familiar and recurring, but the Court has consistently refused either to undertake the task of passing on the 'reasonableness' of a tax that otherwise is within the power of Congress or of state legislative authorities, or to hold that a tax is unconstitutional because it renders a business unprofitable."

417 U.S. at 373, 94 S.Ct. at 2294, 41 L.Ed.2d at 136.

The Court rejected the notion that the judiciary could invalidate an excessive revenue raising tax because it has the "effect" of taking property without compensation. Nor would the Court assume a disguised attempt at confiscation of property through taxation merely because of an excessive tax rate. "This approach," the Court stated, "is contrary * * * to the oft-repeated principle that the judiciary should not infer a legislative attempt to exercise a forbidden power in the form of a seeming tax from the fact, alone, that the tax appears excessive or even so high as to threaten the existence of an occupation or business." *Id.* at 376, 94 S.Ct. at 2296, 41 L.Ed.2d at 138.

■ Furthermore, the Court in *Alco Parking* emphasized that a revenue raising tax is valid under the Fourteenth Amendment despite the taxing authority's ulterior

motives in passing the tax. Even if those motives were to regulate or destroy a business or occupation, the tax remains valid. If the taxing authority was partially or even secondarily motivated by a need to raise revenue and if the tax had the effect of raising some revenue, the existence of other motives does not invalidate the tax. *City of Pittsburgh v. Alco Parking, supra.* See also *Magnano v. Hamilton, supra; J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928).

Though courts have some ability to restrict legislative taxing powers under the Fifth or Fourteenth Amendment, this ability is much more limited than the parties in this case supposed. In *Magnano v. Hamilton, supra,* the United States Supreme Court stated:

"Except in rare and special instances, the due process of law clause contained in the Fifth Amendment is not a limitation upon the taxing power conferred upon Congress by the Constitution. And no reason exists for applying a different rule against a state in the case of the Fourteenth Amendment."

292 U.S. at 44, 54 S.Ct. at 601, 78 L.Ed. at 1114 (citations and footnote omitted).

Apparently focusing upon the "except in rare and special instances" clause, the parties and the Court of Appeals have interpreted this phrase to mean that a revenue raising tax could become so excessive as to constitute an uncompensated taking of property. This reading of *Magnano,* however, is wrong for a number of reasons.

First, in interpreting *Magnano, Alco Parking* makes clear that excessiveness alone will not invalidate a revenue raising tax under the Fourteenth Amendment. Second, *Magnano* itself demonstrates that mere excessiveness was not one of the "rare and special instances." Not only the language of the opinion, but the case law the opinion cites to exemplify the "rare and special instances" confirms that simple overtaxation cannot invalidate an otherwise valid revenue raising measure.

■ The *Magnano* exception, such as it is, has constricted application. The judiciary will overturn a tax statute under the Fifth or Fourteenth Amendment "only if the act be so arbitrary as to compel the conclusion that it does not involve an exertion of the taxing power, but constitutes, in substance and effect, the direct exertion of a different and forbidden power, as, for example, the confiscation of property." *Magnano v. Hamilton,* 292 U.S. at 44, 54 S.Ct. 601, 78 L.Ed. at 1114.

■ The meaning of this statement reveals itself throughout the opinion. An act which is, "in substance and effect, the direct exertion of a different and forbidden power [such as uncompensated confiscation]," is an act which, on its face, attempts to tax things beyond the power of the Legislature. Thus for example, in *Child Labor Tax Case,* 259 U.S. 20, 42 S.Ct. 449, 66 L.Ed. 817 (1922) the Court overturned a federal tax on the employment of child labor because the act was an attempt to regulate a matter exclusively within the control of the state and because the tax was, in fact, a penalty. Similarly, in *Nichols v. Coolidge,* 274 U.S. 531, 47 S.Ct. 710, 71 L.Ed. 1184 (1927), the Court struck down an estate tax which attempted to tax transfers made before the enactment of the estate tax. *See also Heiner v. Donnan,* 285 U.S. 312, 52 S.Ct. 358, 76 L.Ed. 772 (1932); and *Schlesinger v. State of Wisconsin,* 270 U.S. 230, 46 S.Ct. 260, 70 L.Ed. 557 (1926).

■ A tax falling under the *Magnano* exception, therefore, is one which on its face is a direct exercise of a forbidden power, such as confiscation. Conversely, once it is found that the taxing authority has the power to tax the taxpayer in question, courts will refuse otherwise to limit the legislature's revenue-raising power. In short, courts will inquire into the method of taxation but leave the measure of a revenue-raising tax entirely up to the Legislature. *See City of Pittsburgh v. Alco Parking; Stewart Dry Goods Co. v. Lewis, supra,* and *Magnano Co. v. Hamilton, supra.*

These principles, recognized since the beginning of our nation, have sound legal bases. If a tax were judged solely by its rate and impact, every tax could be confiscatory to some degree. A business with a one per cent profit margin could claim a two per cent tax on gross profits effectuated a confiscation of property. At least under the Federal Constitution, courts simply cannot review every tax on a case by case basis to decide whether the tax is excessive for the particular taxpayer. Furthermore, setting tax rates is a legislative function. By striking down "excessive" revenue-raising taxes, we would usurp this function, substituting our concept of public policy for that of the legislative body. *See Stewart Dry Goods Co. v. Lewis, supra.*

The people, in addition, have protection against a legislative abuse of power. Since the legislature must answer to the people, the people will insure that tax rates remain reasonable. Chief Justice John Marshall made this point in *McCulloch v. Maryland, supra:*

> "[T]he power of taxing the people and their property is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which the government may choose to carry it. The only security against the abuse of this power, is found in the structure of the government itself. In imposing a tax, the legislature acts upon its constituents. That is, in general, a sufficient security against erroneous and oppressive taxation."

> "The people of a State, therefore, give to their government a right of taxing themselves and their property, and as the exigencies of government cannot be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislator, and on the influence of the constituents over their representative, to guard them against its abuse."

4 Wheat at 428, 17 U.S. at 428, 4 L.Ed. at 607.

The people have additional safeguards against oppressive taxation. For example, the electorate can put in office trusted leaders who will not enact abusive taxes. Even if such leaders breach the constituents' trust by imposing excessive taxes the electorate can recall office-holders, replacing them with others who will fulfill the public will. *See,* Ariz. Const. Art. 8, pt. 1. In addition, the electorate can, in effect, second-guess legislators through initiative and referendum elections. *See* Ariz. Const. Art. 4, pt. 1 § 1; A.R.S. § 19-141 et seq. Such safeguards are sufficient against abusive taxes.

We now apply these principles to the instant case. As stated, we must decide whether the trial court correctly found Tanque Verde sustained its burden of proving unconstitutional the City's occupational license tax. *See J.C. Penney Co. v. Arizona Department of Revenue,* 125 Ariz. 469, 610 P.2d 471 (1980). In reviewing the trial court's findings, our duty begins and ends with inquiring whether the trial court had before it evidence which might reasonably support its action viewed in the light most favorable to sustaining the findings. We will not weigh conflicting evidence on appeal. *United Bank v. Mesa N.O. Nelson Co.,* 121 Ariz. 438, 590 P.2d 1384 (1979).

Despite this deferential standard of review, it is obvious Tanque Verde failed to prove this tax unconstitutional. Tanque Verde proved the tax was highly burdensome at nearly twenty per cent of gross receipts. Tanque Verde also presented credible evidence that it could not pass the tax on to its customers and that it would be forced out of business because of the tax. There was also evidence that the City's tax would destroy the swap meet industry in Tucson. In addition Tanque Verde presented evidence that the City had ulterior motives in enacting the tax.

Even if true, however, such facts fail to render the tax invalid under the Fourteenth Amendment. Tanque Verde concedes the tax is a valid exercise of Tucson's revenue raising power pursuant to the Tucson Charter. Tanque Verde also concedes that it is a proper subject of

the tax. In the absence of proof that the occupational license tax went beyond the power of the City, however, we will not foray into the legislative domain of setting tax rates. Once it is conceded that a revenue raising tax is legally imposed upon a taxpayer, neither the excessive rate nor the taxing authority's ulterior motives, either alone or together will render the tax unconstitutional. We hold the City of Tucson's occupational license tax levied upon the Tanque Verde Enterprises for the months of April and May, 1981, is not an unconstitutional taking of property.

The opinion of the Court of Appeals is vacated in part and the decision of the trial court is reversed in part.

HOLOHAN, C.J., and HAYS, CAMERON and FELDMAN, JJ., concur.